IN THE UNITED STATES DISTRICT COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 24-11553

_____

JULIE A. SU, ACTING SECRETARY OF LABOR,
U.S. DEPARTMENT OF LABOR,

Plaintiff/Appellee

v.

MEDI-WHEELS OF THE PALM BEACHES, INC,

Defendant/Appellant.

_____

**INITIAL BRIEF FOR APPELLANT**

_____

_____

On Appeal from the United States District Court
for the Southern District of Florida – West Palm Beach Division
Case No. 23-CV-80505

_____

William M. Norris
William M. Norris, P.A.
134 Key Heights Drive
Tavenier, FL 33070
(305)972-5732
wnorrislaw@aol.com
Attorney for Appellant
Medi-Wheels of the Palm
Beaches, Inc.

Case No. 24-11553

## **CERTIFICATE OF INTERESTED PERSONS**

Undersigned counsel certifies the following persons may have an interest in the outcome of this case:

1.  Alfred, Ernest (interested party)

2.  Amman, Malik (interested party)

3.  Beutler, Mark J.   (counsel for Defendant)

4.  Bipram, Latchman (interested party)

5.  Brandstetter, Matthew (interested party)

6.  Cannizzaro, Thomas (interested party)

7.  Castro-Freyre, Mirda (interested party)

8.  Charles, Berice (interested party)

9.  Chastain, Lydia Jones (counsel for Plaintiff)

10. Corujo, Julian (interested party)

11. Davis, Andre (interested party)

12. Davis, Lenny (interested party)

13. Diaz, Anibal (interested party)

14. Drapper, Diogenes Suazo (interested party)

15. Eveque, Maxo (interested party)

C-1

16. Fogarty, William (interested party)

17. Fornaris, Osvaldo Perez (interested party)

18. Freeman, Franklin (interested party)

19. Fuller, Renea (interested party)

20. Greenwald, Candida (interested party)

21. Laguardia, Lismany (interested party)

22. Lindauer, Carlos (interested party)

23. Lomax, Emma L. (counsel for Plaintiff)

24. Longbardi, Michael (interested party)

25. Louis, Joseph (interested party)

26. Medi-Wheels of the Palm Beaches, Inc. (Defendant/Appellant)

27. Mendoza, Jose (interested party)

28. Merced, Jarelis (interested party)

29. Merced-Velez, Bladimir (interested party)

30. Merice, Gemmy (interested party)

31. Munoz, Rosa (interested party)

32. Norris, William M. (counsel for Plaintiff/Appellee)

33. Olcima, Kevin (interested party)

34. Ozuni, Alfred (interested party)

Case No. 24-11553

35.  Pimentel, Christopher (interested party)

36.  Polanco-Sanchez, Naisa (interested party)

37. Reinhart, Bruce E. (U.S. District Court Magistrate Judge)

38.  Rengifo-Freire, Luis (interested party)

39.  Rivas Perez, Mayelin (interested party)

40.  Rodriguez Vasquez, Catherine (interested party)

41.  Romhilt, Dean A. (counsel for Plaintiff/Appellee)

42.  Rosenberg, Robin L. (U.S. District Court Judge)

43.  Sabata, Amy (interested party)

44.  Seda, Alex (interested party)

45.  Smith, Devin (interested party)

46.  Spain, Nicole A. (counsel for Plaintiff)

47.  St. Fleur, Waclech (interested party)

48.  Stone, Vervet (interested party)

49.  Su, Julie A (Plaintiff/Appellee)

50.  Suazo, Johnny (interested party)

51.  Tackett, Robert (interested party)

52.  Telcy, Frendenel (interested party)

Case No. 24-11553

53.  Thelemaque, Lurio (interested party)

54.  Toral-Nunez, Miguel (interested party)

55. Toussaint, Joseph (interested party)

56. Tuschman, Richard David (counsel for Defendant)

57.  United States Department of Labor (Plaintiff/Appellee)

58.  Viaud, Lixon (interested party)

59.  Walters, Raymond (interested party)

60.  Watkins, Phyllis (interested party)

61.  Wilson, Daniel (interested party)

62.  Woods, Thomas (interested party)

Defendant-Appellant further state that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

Dated: August 28, 2024

_//ss// William M. Norris_
William M. Norris
Attorney for Defendant/Appellant.

C-4

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Medi-Wheels of the Palm Beaches, Inc. requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Rule 28-1(c) of the Eleventh Circuit Rules., in that it believes that issues and arguments can be more fully developed with such argument.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS.................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT............................................. i

TABLE OF CITATIONS......................................................................... ii

INTRODUCTION……................................................................... 1

STATEMENT OF JURISDICTION…...................................................... 3

STATEMENT OF THE ISSUES ............................................................ 4

STATEMENT OF THE CASE………………………………………………… 5

       (i)     Course of Proceedings and Disposition in the Court Below................ 5

       (ii)    Statement of the Facts....................................................... 6

       (iii)   Standard of Review.......................................................... 19

SUMMARY OF THE ARGUMENT...................................................... 20

ARGUMENT................................................................................ 21

**I.**    **The district court erred in granting Appellee's motion for summary judgment despite a record establishing material facts were in dispute by competent evidence and Appellant's classification of its drivers as independent contractors were supported by evidence and testimony… 21**

**II.**   **The district court erred in holding the drivers of Medi-Wheel were employees under the FSLA when applying the totality of the factors under the "economic realty" inquiry……………………………………..27**

**III.**  **The district court erred in granting summary judgment on the amount of wages and overtime wages worked and owed to the drivers by Medi-Wheels…………………………………………………………31**

ii

CONCLUSION.................................................................................................. 35

CERTIFICATE OF SERVICE...................................................................... 36

CERTIFICATE OF COMPLIANCE........................................................... 36

iii

**TABLE OF CITATIONS**

Cases:                                                                          Page(s)


*Aimable v. Long & Scott Farms, Inc.*,
20 F.3d 434 (11th Cir. 1994)…………………………………………    27,29

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)……………………………………………………..    22,23

*Armour & Co. v. Wantock*,
323 U.S. 126 (1944)……………………………………………………..    32

*Baas v. Fewless*,
886 F.3d 1088 (11th Cir. 2018)…………………………………………    21

*Birdwell v. City of Gadsden*,
970 F.2d 802 (11th Cir. 1992)…………………………………………    33,34

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)……………………………………………………    21,22

*Crane v. Lifemark Hosps., Inc.*,
898 F.3d 1130 (11th Cir. 2018)…………………………………………..    21

*Halferty v. Pulse Drug Co.*,
864 F.2d 1185 (5th Cir. 1989)…………………………………………    32

*Holifield v. Reno*,
115 F.3d 1555 (11th Cir. 1997)…………………………………………..    22

*In re Medi-Wheels of the Palm Beaches, Inc.*,
No 24-14732 (Bankr. S.D. Fla.)…………………………………………..    6

*Lewis v. City of Union City*,
918 F.3d 1213 (11th Cir. 2019) (en banc)……………………………….    22

iv

*Liebman v. Metro. Life Ins. Co.*,

808 F.3d 1294, 1298 (11th Cir. 2015)…………………………………….. 19

*Lurvey v. Metropolitan Dade Cnty*.,
870 F. Supp. 1570 (S.D. Fla. 1994)……………………………………….. 32,34

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986)……………………………………………………….. 22,23

*Owens v. Local No. 169*,
971 F.2d 347 (9th Cir. 1992)…………………………………………… 34

*Resol. Tr. Corp. v. Dunmar Corp*.,
43 F.3d 587 (11th Cir. 1995) (en banc)…………………………………… 22

*Ryder Int'l Corp. v. First Am. Nat'l Bank*,
943 F.2d 1521 (11th Cir. 1991)………………………………………… 23

*Scantland v. Jeffry Knight, Inc.*,
721 F.3d 1308 (11th Cir. 2013)…………………………………………18,28,29,32

*Skidmore v. Swift & Co*.,
323 U.S. 134 (1944)…………………………………………………….. 33

*Su v. Medi-Wheels of the Palm Beaches, Inc*.,
2024 U.S. Dist. LEXIS 55980 (S.D. Fla. Mar 28, 2024)………………… 2,18

**Other Authorities**

28 U.S.C. 1291…………………………………………………….. 3
28 U.S.C. § 1331……………………………………………………... 3
28 U.S.C. § 1345………………………………………………… 3
29 U.S.C. § 206…………………………………………………….. 7,8
29 U.S.C. § 207……………………………………………………. 30
29 U.S.C. §§ 211………………………………………………… 8

29 U.S.C. § 215(a)(2)……………………………………………….. 8

29 U.S.C. § 215(a)(5)……………………………………………….. 8

29 U.S.C. § 216……………………………………………………….. 2,3

29 U.S.C. § 217……………………………………………………….. 3

29 C.F.R. § 516……………………………………………………….. 8

Fed. R. Civ. P. 56(a)…………………………………………………. 20,21

Fed. R. Civ. P. 56(c)(1)(A)………………………………………… 22

Fed. R. App. P. 32(a)(7)(B)……………………………………….. 36

Fed. R. App. P. 32(a)(6)…………………………………………... 36

Fed. R. App. P. 32(f)……………………………………………….. 36


Fair Labor Standards Act ("FLSA")………………………………. passim

v

**INTRODUCTION**

Appellant Medi-Wheels of the Palm Beaches, Inc. ("Medi-Wheels") began its business working as a subcontractor for Yellow Cab taxi company, providing services to Yellow Cab's at the airports. Later, Medi-Wheels decided to model its business after Yellow Cab and provide transportation services directly to medical Providers, transporting their patients to and from medical appointments.

Medi-Wheels mirrored the manner and method Yellow Cab conducted its business with its drivers who were classified as independent contractors. Drivers engaged by Medi-Wheel were told (1) they were engaged as independent contractors, (2) they would be given opportunities to decide whether to transport a Provider's patient to and from certain locations, (3) they would be required to use and maintain their own vehicle, and (4) they would be required to meet the standards set forth by the Providers. However, the Appellee U.S. Department of Labor ("DOL") claimed Medi-Wheels' drivers were nothing less than employees of Medi-Wheels and entitled to all the benefits and protections of an employee under the Fair Labor Standards Act ("FLSA").

After DOL filed a complaint for injunctive relief, alleging Medi-Wheels violated the minimum wage, overtime, and recordkeeping provisions of the FLSA,

1

29 U.S.C. §§ 215-216, with respect to its drivers, DOL demanded MediWheels pay the its drivers back wages resulting from those violations, as well as equal amount of liquidated damages pursuant to § 216(c). DOL also demanded a permanent injunction, enjoining Medi-Wheels from future violations.

After Medi-Wheels formally denied DOL's allegations that its drivers were employees under the FLSA and asserted affirmative defenses, the parties conducted discovery. DOL then moved for summary judgment. In so doing, DOL "concede[d] that some of the facts in this case are disputed and, as a result, [district] [c]ourt may not grant summary judgment in the Department's favor on the basis of the disputed facts." *DE# 40 reported* at *Su v. Medi-Wheels of the Palm Beaches, Inc.*, 2024 U.S. Dist. LEXIS 55980 *2 (S.D. Fla. Mar. 28, 2024). However, DOL insisted that the undisputed facts nonetheless entitle it to summary judgment in its favor and against Medi-Wheels.

The district court held that the undisputed facts established Medi-Wheels' drivers are not independent contractors, but rather employees entitled to minimum wages, overtime work wages and requirement of recordkeeping by Medi-Wheels. The district court granted DOL's motion for summary judgment and final judgment against Medi-Wheels, which included award of wages and liquidated damages.

Medi-Wheels submits the district court erred in granting summary judgment

when the record clearly shows, and DOL concedes, there were material facts in dispute which required to be decided at trial, not at the pretrial proceeding (summary judgment stage) in the instant case.

## <u>STATEMENT OF JURISDICTION</u>

This is an appeal from a final judgment granting summary judgment in favor of Appellee and against Appellant in the district court entered on March 28, 2024 and final judgment entered on April 14, 2024. *DE# 40, 45*. The district court had jurisdiction under 29 U.S.C. §§ 216 and 217, 28 U.S.C. § 1331 and 1345 and the order is a final one. This Court has jurisdiction of the appeal pursuant to 28 U.S.C. 1291. Notice of appeal was timely filed on May 13, 2024. *DE# 45*.

## STATEMENT OF THE ISSUES

I.      Whether the district court erred in granting Appellee's motion for summary judgment despite a record establishing material facts were in dispute by competent evidence and Appellant's classification of its drivers as independent contractors were supported by evidence and testimony?

II.     Whether the district court erred in holding the drivers of Medi-Wheel were employees under the FSLA when applying the totality of the factors under the "economic realty" inquiry.

III.    Whether the district court erred in granting summary judgment on the amount of wages and overtime wages worked and owed to the drivers by Medi-Wheels

## STATEMENT OF THE CASE

### 1. Course of Proceedings and Disposition in the Court Below

On March 31, 2023, the Appellee Julie Su, Acting Secretary of the U.S. Department of Labor (hereinafter referred to as "Appellee" or "DOL"), filed a complaint against Appellant Medi-Wheels of the Palm Beaches, Inc. (hereinafter referred to as "Appellant" or "Medi-Wheels"), alleging Medi-Wheels violated the overtime, minimum wage, and recordkeeping provisions of the federal Fair Labor Standards Act. *DE# 1*.

On May 5, 2023, DOL filed a "Statement of Claim", (DE# 11), which Medi-Wheels filed a response to said claim. *DE# 13*. On June 6, 2023, Medi-Wheels filed its answer and affirmative defenses to the complaint. DE# 18. On October 27, 2023, DOL filed an amended complaint. *DE# 22*.

On February 5, 2024, DOL filed "Statement of Material Facts for Which Plaintiff Contends There is no Genuine Issue to be Tried" and a motion for summary judgment against Medi-Wheels. *DE# 26, 27*. On March 1, 2024, Medi-Wheels filed its response in opposition to DOL's motion for summary judgment, and response to DOL's Statement of material facts for which there is no genuine issue to be tried. *DE# 31, 32*. DOL filed its reply to both of Medi-Wheels' responses. *DE# 33, 34*. On March 21, 2024, DOL filed a supplement to its motion

for summary judgment. DE# 38. Medi-Wheels filed its supplement to its response in opposition to the motion for summary judgment. *DE# 39*.

On March 28, 2024, the district court below entered an order granting DOL's motion for summary judgment and final judgment granting same. *DE# 40*. The Court entered a final judgment and order dated April 10, 2024. *DE# 41*. On May 13, 2024, Medi-Wheels filed its notice of appeal to this Court, seeking review and reversal of the district court's order and judgment granting summary judgment to DOL and against Medi-Wheels. *DE# 45*.

On May 14, 2024, Medi-Wheels filed for federal bankruptcy protection under subchapter V (Chapter 11) of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Florida. *In re Medi-Wheels of the Palm Beaches, Inc*., No 24-14732 (Bankr. S.D. Fla.) (case pending). On May 14, 2024, Medi-Wheels filed the notice of bankruptcy filing in the district court below. *DE# 46*. This Court, by a one-panel judge denied Medi-Wheels' motion to stay the instant appeal because of the automatic stay under the bankruptcy code.

## 2. Statement of the Facts

DOL filed a complaint to "enjoin and restrain Defendant Medi-Wheels of the Palm Beaches, Inc. (Medi-Wheels) from violating 29 U.S.C. §§ 215(a)(2) and 215(a)(5)[.]" and to "recover unpaid minimum wages and overtime compensation,

6

and an award of an equal amount as liquidated damages, owed to certain employees of Medi-Wheels[.]" *DE# 22, p.1*.

DOL alleged Medi-Wheels was providing medical transportation services to its clients in South Florida by using what Medi-Wheels labeled "independent contractors" – a misclassification claimed by DOL. *Id*. DOL alleged that the drivers hired by Medi-Wheels were actually employees as a matter of federal labor laws because of the following:

    a. "drivers are hired, fired, and supervised by management personnel for Medi-Wheels and are charged a fee if they are late to pick up a client/patient."

    b. "drivers are paid by the mile for assignments doled out by Medi-Wheels"

    c. "no opportunity for additional income or profit through the exercise of managerial skill or increased efficiency in the manner or means of accomplishing the work."

    d. "Medi-Wheels trains and instructs the drivers on how to adequately perform their driver services and assigns the drivers to pick up specific clients for medical appointments."

    e. "Medi-Wheels determines the rate and method of payment for the driver services and there is no negotiation; Medi-Wheels does not keep track of the drivers' hours-worked and does not pay the drivers an overtime rate for hours worked over forty in a work week."

    f. Medi-Wheels requires the drivers to purchase and wear a shirt with the company logo and requires the drivers to purchase and carry first-aid kits and magnetic signs in their vehicles.

g. Medi-Wheels makes deductions from the drivers' weekly pay to cover items primarily for the benefit of the employer, such as lease and license fees"; "In some weeks, these deductions drive the drivers' hourly rates below the applicable minimum wage rate, in violation of 29 U.S.C. §§ 206 and 215(a)(2)."

*DE# 22, pp.3-4.* DOL alleged that the drivers are employees not independent contractors of Medi-Wheels, Medi-Wheels failed to pay the drivers minimum hourly wage for all hours worked, a violation of 29 U.S.C. §§ 206 and 215(a)(2), as well as overtime rate for work over 40 hours in a workweek. *Id., p.5*.

DOL further alleged that Medi-Wheels "repeatedly violated 29 U.S.C. §§ 211 and 215(a)(5), and 29 C.F.R. § 516, by failing to make, keep, and preserve adequate and accurate records of the persons employed and of the wages, hours, and other conditions and practices of employment maintained by them, as required." *Id*.

### **Medi-Wheels Presents Evidence of its Hiring and Use of its Drivers**

Medi-Wheels presented evidence and sworn testimony in the district court below that the drivers in this case had significant freedom to control whom they worked for, when they worked, where they worked, and how they worked. Such freedoms are consistent with an independent contractor status and not the "usual path" of an employee. Additionally, although the drivers were subject to various rules, most of these rules were imposed by Defendant's clients, the insurance companies that provided the work ("Providers") and were not actively enforced by

Defendant.

During the relevant period of DOL's complaint, drivers could and did drive for other companies such as Uber, Lyft, and Door Dash. *DE # 32-1,3,5,8* [Sabata Dec. ¶ 1; *DE # 32-3* Rengifo Dec. ¶ 1; Fuller Dec. ¶ 1; Tocci 18:1-6; 137:1-11; 139:3-4]. Drivers were also free to perform "personals," i.e., transportation for clients who called the drivers directly. *DE# 32-8* [Tocci 62:15-63:11; 138:25-139:1] In fact, some drivers had their own business cards which had their own company name on them. *Id.*, [Tocci 68:6-10; 138:4-8].

For example, driver David Winfrey had his own business cards, which he handed out to customers and prospective customers. *DE# 32-2* [Winfrey Dec. ¶ 4]. Winfrey received about 30% of his work from Medi-Wheels; the rest came from other sources, including word of mouth and the car line at the airport. Id., [Winfrey Dec. ¶ 4] Winfrey also had one or two drivers who worked for him and drove for Medi-Wheels. DE# 32-8 [Tocci 64:21-24]

Drivers had input as to when and where they wanted to work, and Medi-Wheels assigned trips to drivers based on these parameters. *Id*., [Tocci 80:17-81:6; D. Suazo 56:21-57:3]. Drivers set their own schedules. DE# 32-1,2,3,4,5,6 [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3]. They received assignments from Medi-Wheels via the Transitrak

9

application (dispatch software) but fit the assignments into their schedules. *Id*. DE# 32-1,2,3,4,5,6,8 [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3; Tocci 78:12-18]

Drivers were free to decline assignments from Medi-Wheels. *Id*., [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3;Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3.; Tocci 78:19-23; 80:11-16]. Drivers were also able to and frequently did call Medi-Wheels' dispatchers to change their assignments. *DE# 32-8* [Tocci 82:19-23; 106:12]. Drivers declined assignments based on the price of the fare, the geographic area of the trip, a conflict in their schedule, or for other reasons. *Id*., [Tocci 106:15-107:5; 109:2-12]. For example, when driver Amy Sabata hurt her back and could not assist patients with wheelchairs or walkers, she declined these assignments. *DE# 32-1* [Sabata Dec. ¶ 4]. During the day, if the drivers had downtime, they could go home and take a nap or do chores. *Id*., [Sabata Dec. ¶ 4]

Another example, a dialysis appointment takes about four hours. If a driver was scheduled to do a round trip, the driver could do whatever he wanted after dropping off the patient at the appointment before picking up the patient at the end of the appointment. *DE# 32-8* [Tocci 98:5-19]. Drivers were also free to take breaks and meals between trips. *Id*., [Tocci 104:17-25; Tocci Dec. ¶ 11]. Indeed, even when there were not more than 30 minutes between scheduled trips, drivers often

10

took 30 minutes or more to eat, and would arrive late to the next scheduled trip. Drivers were typically not penalized for being late. *Id.*, [Tocci Dec. ¶ 11]. Medi-Wheels did not guarantee any particular volume of work. *DE# 32-1, 8* [Sabata Dec. ¶ 4; Tocci 81:18-24; 90:6-91:2]. If Medi-Wheels had work for the drivers, it was the drivers' decision how much to work. DE# 32-1,2,3,4,5,6,8 [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶¶ 3 and 6; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3; Tocci 116:5-9].

Drivers were not required to obtain permission from Medi-Wheels before taking time off for vacation or other personal reasons. DE# 32-1,2,4,5,6 [Sabata Dec. ¶ 5; Winfrey Dec. ¶ 7; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3] When a driver took time off, the driver would simply notified Medi-Wheels before taking time off. *DE# 32-1* [Sabata Dec. ¶ 5]. Similarly, driver Robert Tackett told Medi-Wheels' dispatcher Mike Stone he was going to take a month off. Stone said, "Okay, let me know when you're ready to come back." *DE# 32-6* [Tackett Dec. ¶ 3]. Driver Tackett also decided at some point for personal reasons not to work a full day. *Id.*, 6, 8 [Tackett Dec. ¶ 3; Tocci 116:10-19].

Rather, for the drivers at issue in this case, i.e., those who performed non-emergency medical transportation, Defendant's business model mimicked the Yellow Cab model under which the majority of the drivers that Medi-Wheels hired

11

had worked in the past. *DE# 32-8* [Tocci 17:22-25; 19:9-20:1; 41:12-42:5] In fact, Yellow Cab had similar contracts with insurance providers ("Providers") such as LogistiCare, MTM, and Access2Care to provide non-emergency medical transportation. *Id*., [Tocci 21:20-23]. Medi-Wheels' clients imposed various rules and requirements in their contracts relating to safety and quality control.

The Providers required the drivers to submit to drug testing and a medical examination. *Id*., [Tocci 35:18-20]. The Providers also established certain rules for hiring drivers. The Providers required that Medi-Wheels not use any drivers who were convicted of three or more minor motor vehicle moving violations within the previous 24 months. *Id*., [Tocci 35:23-36:2]. The Providers also imposed certain rules, such as not using the cell phone will driving, and no eating, drinking, or smoking in the vehicle. *DE# 32-1,5* [Sabata Dec. ¶ 3; Fuller Dec. ¶ 5]. These rules were set by the Providers, not by Medi-Wheels. *Id*., [Sabata Dec. ¶ 3; Fuller Dec. ¶ 5]. Medi-Wheels did not actively enforce compliance with these rules; only if a complaint was received would Medi-Wheels remind the driver of the obligations of the Provider's contract. *Id.*, [Tocci 28:6-16].

Medi-Wheels did not itself provide the drivers with a handbook or a list of rules or procedures they had to follow. *Id*., [Tocci 28:17-21; 54:19-24]. Medi-Wheels did not survey passengers to gauge their satisfaction with the drivers'

12

services. *Id*., [Tocci 29:10-13]. Nor did Medi-Wheels perform spot checks of drivers to ensure that the drivers were following the Providers' rules. *Id.*, [Tocci 29:4-7]. Some drivers openly flouted the Providers' rules, and Medi-Wheels still chose not to enforce them. The Providers' contracts required that the drivers wear a Medi-Wheels shirt, but Medi-Wheels did not enforce this rule. *Id*., [Tocci 69:13-25] Several drivers did not wear Medi-Wheels shirts or believed that it was not a requirement. *DE# 32-1,3,4,5,6* [Sabata Dec. ¶ 5; Rengifo Dec. ¶ 5; Longobardi Dec. ¶ 5; Fuller Dec. ¶ 5; Tackett Dec. ¶ 5]. Similarly, the drivers also were given magnetic Medi-Wheels signs for their cars, but many drivers did not use them, and Medi-Wheels did not pressure them to do so. *DE# 32-6,2, 8* [Tackett Dec. ¶ 5; Winfrey Dec. ¶ 6; Tocci 70:1-15].

Moreover, as noted above, drivers were typically not penalized for being late to an assigned trip. *DE# 32-8* [Tocci Dec. ¶ 11] Aside from about four wheelchair-compatible vehicles that Medi-Wheels purchased, the drivers used their own personal vehicles to perform their job. *Id.*, [Tocci 32:4-25] Drivers decided what vehicles to purchase, how to maintain their vehicles, and whether to repair or replace them, buy new tires, etc. *DE# 32-1,3,4,5,6,10* [Sabata Dec. ¶ 2; Rengifo Dec. ¶ 2; Longobardi Dec. ¶ 2; Fuller Dec. ¶ 3; Tackett Dec. ¶ 2; D. Suazo 29:20-30:16; J. Suazo 53:25-54:5]. Drivers also decided where to buy fuel for their

13

vehicles. *DE# 32-10* [D. Suazo 28:22-29:3]. Such decisions affected the profitability of the drivers' businesses. DE# 32-1,3,4,5,6 [Sabata Dec. ¶ 2; Rengifo Dec. ¶ 2; Longobardi Dec. ¶ 2; Fuller Dec. ¶ 3; Tackett Dec. ¶ 2].

To the extent that the drivers were subject to penalties if they were late or caused a rider to miss an assigned appointment, the drivers' ability to avoid such penalties was an indication of their skill in managing their schedules.

**DOL's Statement of Undisputed Material Facts for Summary Judgment which were disputed by competent evidence by Medi-Wheels.**

DOL's claim that certain material facts bearing on the resolution of its motion for summary judgment was refuted by competent testimony provided by trial witnesses of Medi-Wheels on the following material facts proffered by DOL and refuted by Medi-Wheels:

a. **DOL**: "Medi-Wheels required the Drivers' . . . . to produce their vehicles for inspection initially and periodically thereafter." *DE# 26, p.4, n.19*.

   **Medi-Wheels**: Medi-Wheels did not have the drivers "produce their vehicles for inspection". *DE 32, p.2, n.19*.

b. **DOL**: "Drivers did not reject their assigned routes or portions of their assigned routes unless there was an emergency." *DE# 26, p.5, n.27*.

   **Medi-Wheels:** Drivers were free to decline assignments from Medi-Wheels. Drivers were able to and did decline assignments based on the price of the fare, the geographic area of the trip, a conflict in their schedule, or for other reasons. Drivers were also able to and frequently did call Medi-Wheels' dispatchers to change their assignments or decline

14

assignments. *DE 32, p.2,* n.27.

c. **DOL: "**Medi-Wheels required its Drivers to record within the Transitrak application certain work tasks, including when they arrived at the pick-up site and when they completed the passenger drop-off." *DE# 26, p.6, n.31.*

   **Medi-Wheels:** The Providers, not Medi-Wheels, required that drivers indicate within the Transitrak application when they arrived at the pick-up site and when they completed the passenger drop-off. *DE 32, p.3,* n.31.

d. **DOL:** "Medi-Wheels required Drivers to wear a uniform shirt identifying them as 'Medi-Wheels' drivers" *DE# 26, p.6, n.35.*

   **Medi-Wheels:** The Providers' contracts required that the drivers wear a Medi-Wheels shirt, but Medi-Wheels did not enforce this rule. [Tocci 69:13-25] Several drivers did not wear Medi-Wheels shirts or believed that it was not a requirement. *DE 32, p.3,* n.35.

e. **DOL: "**Medi-Wheels required Drivers to affix a magnetic "Medi-Wheels" sign on their vehicles." *DE# 26, p.6, n.36*

   **Medi-Wheels:** The drivers were given magnetic Medi-Wheels signs for their cars, but many drivers did not use them, and Medi-Wheels did not pressure them to do so. *DE 32, p.3,* n.36.

f. **DOL: "**On days Drivers worked, Medi-Wheels typically assigned Drivers back-to-back rides for the full day." "Drivers often did not have time for a meal break or even to use the bathroom." *DE# 26, p.6, n.38-39.*

   **Medi-Wheels:** Drivers often had downtime of more than 30 minutes between trips, during which time they were free to take breaks and meals. In fact, even when there were not more than 30 minutes between scheduled trips, drivers often took 30 minutes or more to eat, and would arrive late to the next scheduled trip. Drivers were typically not penalized for being late. *DE 32, p.3,,* n.38,39.

g. **DOL:** "Drivers did not have time to work for other companies such as

15

Uber or Lyft." *DE# 26, p.7, n.40.*

**Medi-Wheels:** During the relevant period, some drivers drove for other companies such as Uber, Lyft, and Door Dash. *DE 32, p.3, n.40.*

h.  **DOL:** "The Drivers did not have control over which trips were assigned to them." *DE# 26, p.7, n.43.*

   **Medi-Wheels:** Drivers were free to decline assignments from Medi-Wheels. Drivers were able to and did decline assignments based on the price of the fare, the geographic area of the trip, a conflict in their schedule, or for other reasons. Drivers were also able to and frequently did call Medi-Wheels' dispatchers to change their assignments. *DE# 32, p.4,* n.43

i.  **DOL:** "Drivers did not know exactly how much each ride paid when it was assigned." *DE# 26, p.7, n.45.*

   **Medi-Wheels:** Drivers knew the rate per mile that each Provider paid, and the name of the Provider and mileage of each trip was included in the trip information; therefore, the payment for each ride was a matter of simple arithmetic. *DE# 32, p.4,* n.45.

j.  **DOL:** Medi-Wheels deducted "liquidated damages" or "late fee" of $50 or more, for the Driver's non-compliance with Medi-Wheels' rules. *DE# 26, p.9, n.65*

   **Medi-Wheels:** Drivers were not penalized for being late or for violating the Providers' other rules. *DE# 32, p.5,* n.63.

k.  **DOL:** "The Secretary computed each Driver's daily hours-worked as including all time between the first and last event recorded by the Driver in the Transitrak application each day . . ." "The Secretary computes that for the time between June 20, 2020 and December 1, 2022, Medi-Wheels owes the 59 Drivers listed on Amended Appendix A back wages totaling $26,446.14 for violations of Section 6 of the Act, and back wages totaling $358,143.32 for violations of Section 7 of the Act." *DE# 26, p.10, n.71, 76.*

16

**Medi-Wheels:** Defendant disputed that the assumptions underlying DOL's methodology is correct. Drivers often had downtime of more than 30 minutes between trips, during which time they were free to take breaks and meals. [Tocci Dec. ¶¶ 11, 12] If the drivers had downtime, they could go home and take a nap or do chores. *DE# 32, p.6,* n.71, 76.

l. **DOL:** "The Drivers often worked in excess of 40 hours per work week." *DE# 26, p.10, n.72.*

**Medi-Wheels:** There were many weeks in which the drivers did not work more than 40 hours per week. *DE# 32, p.6,* n.72.

Medi-Wheels also provided testimony and evidence that Medi-Wheels began transportation services like Yellow Cab, a company that treated all drivers as independent contractors. *DE# 32*, p.7. Medi-Wheels was modeled and operated just like Yellow Cab. *Id*. Medi-Wheels met with its drivers, explaining that it operated just like Yellow Cab where the drivers were independent contractors. All the drivers agreed to Medi-Wheels business model and treatment as independent contractors. *Id*.

Medi-Wheels informed the drivers that the Providers set the hiring standards, required training and performed inspections and established rules on transportation of their patients/clients. *Id*., pp.9-11. Medi-Wheels also made clear to each of its drivers that the (1) drivers used their own personal vehicles to perform their job, (2) drivers decided what vehicles to purchase, how to maintain their vehicles, and whether to repair or replace them, buy new tires, etc, and (4) drivers also decided

17

where to buy fuel for their vehicles. *Id*.

**District Court grants summary judgment notwithstanding material facts
in dispute by competent evidence and testimony.**

The district court below noted that DOL conceded there were material facts
in dispute at the summary judgment proceeding. *DE# 40 reported at Su v. Medi-
Wheels of the Palm Beaches, Inc.*, 2024 U.S. Dist. LEXIS 55980 *2 (S.D. Fla. Mar
28, 2024). Notwithstanding the material factual disputes in the record, the district
court determined that when applying "'economic reality' test set forth in the case
of *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013)[,]" id. at
*3, the DOL was entitled to summary judgment on all its claims for relief.

In granting summary judgment for DOL, the district court held Medi-Wheels
had control over the drivers given (1) the contracts written or oral entered into by
the drivers permitted Medi-Wheels to hire and fire drivers, (2) Medi-Wheels
required training for the drivers and maintained the drivers' licensing and
background information, (3) MediWheels required drivers to have their vehicles
inspected and covered under its insurance policy, (4) Medi-Wheels controlled the
routes for drivers to pick up clients of the Providers, (5) Drivers could be penalized
by MediWheels if they are late or miss a pickup of a Provider's client and Provider
penalizes Medi-Wheels for being late or missing a pickup, (6) Medi-Wheels was
able to monitored the drivers' activities by way of a GPS device, and (7) Medi-

Wheels' rules required the drivers to wear a uniform that identified them as a driver for Medi-Wheels. *Id*., at *6-8.

In the district court's view, "this case does not raise a close question" even when applying the record evidence in the light most favorable to the Defendant. *Id*. at *16. The district court then determined that the evidence submitted by DOL was sufficient to meet its "burden to estimate the amount for with the drivers were improperly compensated." *Id.* at *20. The district court held Medi-Wheels evidence and testimony refuting DOL's claims and calculations of wages owed was too vague to trump the factual claims asserted by DOL. *Id.* at *23 ("Mr. Tocci's testimony references what the drivers 'could have' done with their time because the drivers 'did whatever they wanted.' As a result, Mr. Tocci testified that the drivers could have had breaks 'in the morning' or 'at night.' This vague testimony must be juxtaposed to the evidence in support of the Department's Motion. The Department established with undisputed evidence that the Defendant did not schedule any time into the routes for the drivers to have breaks.").

### 3.   <u>Standards of Review</u>

"We review *de novo* a district court's grant of summary judgment." *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015). Summary judgment is appropriate only when the movant shows that no genuine issue of material fact

exists and that movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*.

## SUMMARY OF THE ARGUMENT

The district court erred as a matter of law in granting summary judgment to Appellee DOL and against Medi-Wheels where there were material facts in dispute and can only be resolved at trial – facts which Appellee conceded were in dispute. Although these disputed facts were apparent to the district court, the court pushed them to aside, and used other facts, which viewed in the light most favorable to Appellee not Appellant, to justify granting summary judgment on the issue that Medi-Wheels' drivers were employees, not independent contractors as claimed by Medi-Wheels. In fact, the district court viewed the testimony of Medi-Wheels' corporate officer as "vague" when applying it to certain factual claims by DOL.

Further, the record evidence established that drivers who worked for Medi-Wheels entered into a written or oral contract in some cases with Medi-Wheels that they were deemed independent contractors who were free to work for Medi-Wheels while working for Uber or Lyft or other transportation network company, and can decide when to pick up clients of Providers for Medi-Wheels.

Finally, the district court erred in determining the amount of wages and overtime work wages due DOL when there were competing evidence presented by

Medi-Wheels that the drivers took breaks or lunch meals when they chose to do so or used their free time to drive for Uber or Lyft.

## **ARGUMENT**

I.    **The district court erred in granting Appellee's motion for summary judgment despite a record establishing material facts were in dispute by competent evidence and Appellant's classification of its drivers as <u>independent contractors were supported by evidence and testimony</u>.**

Summary judgment is authorized when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Baas v. Fewless*, 886 F.3d 1088, 1091 (11th Cir. 2018). The movant carries this burden by showing the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *See Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1134 (11th Cir. 2018).

Once the moving party has adequately supported its motion, the non-moving party must come forward with specific facts that demonstrate the existence of a

21

genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574, 587 (1986). The non-moving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-moving party's case is insufficient to defeat a motion for summary judgment; rather, there must be evidence on which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The non-moving party cannot defeat summary judgment by relying upon conclusory assertions. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019) (en banc). Rather, "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." *Fed. R. Civ. P. 56(c)(1)(A)*; *see also Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (*en banc*) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.").

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *See Anderson*, 477 U.S. at 249-50. A factual dispute

22

is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* at 587 (internal quotation marks omitted). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259 (internal quotation marks omitted).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See id.* at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. *Anderson*, 477 U.S. at 249. Disputed facts that do not resolve or affect the outcome of a suit will not preclude the entry of summary judgment. *Id.*

23

**Disputed Material Facts**

DOL claimed Medi-Wheels mischaracterized or mislabeled its drivers as independent contractors. DOL alleged each of the drivers were actually employees of Medi-Wheels given the drivers were asked to wear a Medi-Wheels' shirt, assigned routes to pick up patients for Providers, exposed to penalties for being late or missed pickups of the patients, Medi-Wheels exerted considerable control over the drivers and their work, drivers had little or no opportunity for profit or loss, drivers did not contribute to their economic independence, drivers worked on a continuous and indefinite duration, and drivers were integral to Medi-Wheels' business.

Medi-Wheels presented testimony from its corporate officers and drivers which established the following:

a. Medi-Wheels did not have the drivers "produce their vehicles for inspection". *DE 32, p.2, n.19*.

b. Drivers were free to decline assignments from Medi-Wheels. Drivers were able to and did decline assignments based on the price of the fare, the geographic area of the trip, a conflict in their schedule, or for other reasons. Drivers were also able to and frequently did call Medi-Wheels' dispatchers to change their assignments or decline assignments. *Id*., at n.27.

c. The Providers, not Medi-Wheels, required that drivers indicate within the Transitrak application when they arrived at the pick-up site and when they completed the passenger drop-off. *Id*., at n.31.

d. The Providers' contracts required that the drivers wear a Medi-Wheels

24

shirt, but Medi-Wheels did not enforce this rule. [Tocci 69:13-25] Several drivers did not wear Medi-Wheels shirts or believed that it was not a requirement. *Id.*, n.35.

e. The drivers were given magnetic Medi-Wheels signs for their cars, but many drivers did not use them, and Medi-Wheels did not pressure them to do so. *Id.*, n.36.

f. Drivers often had downtime of more than 30 minutes between trips, during which time they were free to take breaks and meals. In fact, even when there were not more than 30 minutes between scheduled trips, drivers often took 30 minutes or more to eat, and would arrive late to the next scheduled trip. Drivers were typically not penalized for being late. *Id.*, n.38,39.

g. During the relevant period, some drivers drove for other companies such as Uber, Lyft, and Door Dash. *Id.*, n.40.

h. Drivers were free to decline assignments from Medi-Wheels. Drivers were able to and did decline assignments based on the price of the fare, the geographic area of the trip, a conflict in their schedule, or for other reasons. Drivers were also able to and frequently did call Medi-Wheels' dispatchers to change their assignments. Id., n.43

i. Drivers knew the rate per mile that each Provider paid, and the name of the Provider and mileage of each trip was included in the trip information; therefore, the payment for each ride was a matter of simple arithmetic. *Id.*, n.45.

j. Drivers were not penalized for being late or for violating the Providers' other rules. *Id.*, n.63.

k. Medi-Wheels disputed the assumptions underlying DOL's methodology of paying wages and overtime wages worked is correct. Drivers often had downtime of more than 30 minutes between trips, during which time they were free to take breaks and meals. [Tocci Dec. ¶¶ 11, 12] If the drivers had downtime, they could go home and take a nap or do chores. *Id.*, n.71, 76.

l. There were many weeks in which the drivers did not work more than 40 hours per week. *Id.*, n.72.

m. If the drivers had downtime, they could go home and take a nap or do chores or drive for Uber or Lyft. *Id.*, p.76.

n. Medi-Wheels informed the drivers that the Providers set the hiring standards, required training and performed inspections and established rules on transportation of their patients/clients. *Id.*, pp.9-11.

o. Medi-Wheels also made clear to each of its drivers that the (1) drivers used their own personal vehicles to perform their job, (2) drivers decided what vehicles to purchase, how to maintain their vehicles, and whether to repair or replace them, buy new tires, etc, and (4) drivers also decided where to buy fuel for their vehicles. *Id.*

The drivers controlled their economic income and growth by using their chauffer skills working for Uber, Lyft, Door Dash and other transportation network companies. *Id.*, p.7-8. "Drivers were also free to perform "personals," i.e., transportation for clients that call the drivers directly." *Id.*, p.8, n.97. "Some drivers had their own business cards which had their own company name on them." *Id.*, p.8, n.98. The drivers set their own schedules and worked as much or as little as they wanted to work. *Id.*, p.8-9. Drivers were free to do whatever they wanted to do so long as when they picked up a patient of the Provider, they transport the patient to the designated location. *Id.*, p.9. Hiring standards, required training, inspections of vehicles, and rules were established by the Provider of the patients, not Medi-Wheels. *Id.*

26

With the above disputed facts and even more disputed facts detailed in Medi-Wheels' response (DE# 32, pp.11-13) to DOL's statement of undisputed facts, the district court decided that DOL's version of facts was persuasive and dispositive of DOL's motion for summary judgment in its favor. At the least, the district court elected to view the disputed facts proffered by DOL in the light most favorable to DOL. Under these circumstances, Appellant respectfully submits the district court erred in granting DOL's motion for summary judgment as a matter of clearly established law given the material facts were clearly disputed by competent evidence and testimony – material facts which bear on the claims raised by Appellee DOL.

II.       **The district court erred in holding the drivers of Medi-Wheel were employees under the FSLA when applying the totality of the <u>factors under the "economic realty" inquiry.</u>**

To determine whether an individual falls into the category of covered "employee" or exempted "independent contractor," courts look to the "economic reality" of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence. *See Aimable v. Long & Scott Farms, Inc.*, 20 F.3d 434, 439 (11th Cir. 1994) ("To determine whether an employer/employee relationship exists for purposes of federal welfare legislation, we look . . . to the 'economic reality' of all the circumstances concerning whether

27

the putative employee is economically dependent upon the alleged employer.").

"This inquiry is not governed by the 'label' put on the relationship by the parties or

the contract controlling that relationship, but rather focuses on whether 'the work

done, in its essence, follows the usual path of an employee.'" *Scantland v. Jeffry*

*Knight, Inc*, 721 F.3d 1308, 1311 (11th Cir. 2013).

Courts have applied a multifactor test to guide the "economic reality"

inquiry, which weighs the following six factors:

> (1) the nature and degree of the alleged employer's control as to
> the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss
> depending upon his managerial skill;
> (3) the alleged employee's investment in equipment or
> materials required for his task, or his employment of workers;
> (4) whether the service rendered requires a special skill;
> (5) the degree of permanency and duration of the working
> relationship;
> (6) the extent to which the service rendered is an integral part
> of the alleged employer's business.

*Id.* at 1312. While these factors "serve as guides, the overarching focus of the

inquiry is economic dependence." *Id.* The court's ultimate focus is on "on whether

an individual is 'in business for himself' or is "dependent upon finding employment

in the business of others." *Id.* at 1312 (citation omitted).

The evidence presented by MediWheels, although disputed by DOL, created

an independent contractor relationship (not an employment relationship) and

therefore a decision to be made by a jury at trial if DOL's FLSA claims are not viable.

This Court has been clear that the independent contractor inquiry "is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee.'" *Scantland*, 721 F.3d at 1311 (citations omitted). Here, the evidence presented by Medi-Wheels in the record, although disputed by DOL's evidence, would allow the trier of fact to determine the "economic reality of all the circumstances," *Aimable*, 20 F.3d at 439, or meaningfully consider the six *Scantland* factors as required.

**Medi-Wheels did not have complete control of the drivers.**

As shown above, the drivers picked their own schedule, they decided whether to work a particular day or accept a particular transportation job, they decided when to take a break or go work for Uber or Lyft. The only commitment each driver had was upon taking the transportation job, they had to pick up the Provider's patient and bring the patient to a particular location at a specific time. The drivers were required to keep their vehicles operating safely and have them inspected to ensure their were no safety issues – an inspection to be done at a facility chosen by the drivers.

**Drivers had opportunity for profit or loss depending upon how they managed their driving skills and time.**

Medi-Wheel presented evidence that the drivers were free to work for any other transportation network company like Uber or Lyft in between trips for Medi-Wheels or simply for the entire day if they so choose. However, the agreement between MediWheels and drivers was that once the driver accepted the transportation job, he needed to be on time on the pickup and delivery of the Provider's patient. Thus, the drivers were free to take a transportation job from Uber or Lyft after dropping off the Provider's patient in a particular area, generating substantial income and efficiency in the drivers' business in transporting people. The drivers' profits increased by their own decision making, not at all guided or impeded by Medi-Wheels.

**Drivers purchased, maintained and repaired their own vehicles at their own costs, including fuel.**

Medi-Wheels presented evidence that the drivers purchased, maintained and repaired their own equipment, which included their vehicles. They purchased the fuel for the vehicles at their place of choosing.

**Degree of permanency and duration of the working relationship**

The drivers were free to terminate the agreement they had with Medi-Wheels with or without cause. And, Medi-Wheels was entitled to do the same. The drivers

30

were free to accept the transportation jobs or decide not to make any pickups for Medi-Wheels. As the officials of Medi-Wheels testified, Medi-Wheel's business and operation mirrored the Yellow Cab business model – a transportation company having independent contractors as drivers.

Here, the drivers for Medi-Wheels were akin to taxi cab drivers for Yellow Cab or drivers for Uber or Lyft. If the drivers wanted to accept the transportation jobs from Medi-Wheels they were free to do so or decline to work or accept a job. Medi-Wheels was able to exist because of its contracts with certain Providers - contracts which were subject to renewal by the Providers.

### The drivers' service rendered to Medi-Wheels was an important component to Medi-Wheels' business.

It is undisputed that Medi-Wheels' primary business was transportation of the Providers' patients from location to another location. And to provide such service to the Providers, Medi-Wheel sought out independent drivers who were engaged in transportation network services and wanted to do transporting of Providers' patients when they were free to do so.

### III.    The district court erred in granting summary judgment on the amount of wages and overtime wages worked and owed to the drivers by Medi-Wheels.

The FLSA's overtime and minimum wage protections extend only to "employees" and not to "independent contractors." 29 U.S.C. §§ 206 , 207;

*Scantland,* 721 F.3d at 1311 (citation omitted). Medi-Wheels respectfully submits the district court erred in determining whether the drivers were employees given the disputed material facts shown above.

Further, the district court erred in awarding the drivers wages and overtime wages worked given the disputed facts presented in this case. Medi-Wheels' corporate official testified that the drivers took meal breaks or time off when they decided to take a break or enjoy free time. Further, the drivers went to work for Uber or Lyft after dropping off a Provider's patient at a designated location. With this competent testimony presented by Medi-Wheels, in the absent of specific testimony at trial for the trier of fact to decide, the district court at the summary judgment stage erred in determining an amount of wages and overtime wages worked by the drivers.

Under long-standing FLSA precedent, time in which an employee is "engaged to wait", that is, "time spent primarily for the benefit of the employer and his business," is compensable. *See Armour & Co. v. Wantock*, 323 U.S. 126, 132, 65 S. Ct. 165, 89 L. Ed. 118 (1944). Time in which an employee is "waiting to be engaged," i.e., time that the employee can use "effectively for his or her own purposes," is not. *Lurvey v. Metropolitan Dade Cnty*., 870 F. Supp. 1570, 1578 (S.D. Fla. 1994) (quoting *Halferty v. Pulse Drug Co*., 864 F.2d 1185, 1189 (5th Cir.

32

1989)). "The question of whether the employees are working during this time for purposes of the FLSA depends on the degree to which the employee may use the time for personal activities." *Birdwell v. City of Gadsden*, 970 F.2d 802, 807 (11th Cir. 1992).

The difference between time "engaged to wait" and "waiting to be engaged" is highly fact-specific, and is "dependent upon all the circumstances of the case." *See Skidmore v. Swift & Co*., 323 U.S. 134, 136, 65 S. Ct. 161, 89 L. Ed. 124 (1944). This Court has held that a district court analyzing this distinction should consider "the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances." *Birdwell*, 970 F.2d at 808 (quoting *Skidmore*, 323 U.S. at 137).

This Court has also considered factors such as "(1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employees' movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in

33

time." *Lurvey*, 870 F. Supp. at 1576 (citing *Owens v. Local No. 169*, 971 F.2d 347, 350 (9th Cir. 1992)). "*It is for the court to determine if a set of facts gives rise to liability; it is for the jury to determine if those facts exist." Id*. (quoting *Birdwell*, 970 F.2d at 807-08) (emphasis in original).

Here, the evidence presented by Medi-Wheels paints a vivid picture that the drivers were free to do what they wanted to do either between trips for Medi-Wheels or simply after a transportation job for Medi-Wheels. For example, the drivers went to work for Uber or Lyft after delivering a Provider's patient to a certain location. The drivers made good economic use of their time to their benefit. Certainly, the drivers should not be allowed to use the time waiting to be called for another job for Medi-Wheels to earn money from Uber or Lyft jobs, yet be entitled to wages or overtime wages which they did not work.

Medi-Wheels' evidence at the summary judgment stage in lower court creates a dispute on the material facts bearing on the amount of wages or overtime wages worked by the drivers. Applying the holdings of this Court cited above, the district court erred in deciding that there were wages and overtime wages worked by the drivers as well as the monetary amount of wages and overtime worked by the divers.

## <u>CONCLUSION</u>

For the foregoing reasons, Appellant Medi-Wheels of the Palm Beaches, Inc. respectfully requests the Court vacate the district court's order and final judgment granting summary judgment (DE# 40) and monetary award (DE#45) on all issues to in favor of Appellee and against Appellant and remand the case for a trial on the merits.

Respectfully submitted,

*//ss// William M. Norris*
William M. Norris
William M. Norris, P.A.
134 Key Heights Drive
Tavenier, FL 33070
(305)972-5732
wnorrislaw@aol.com
Attorney for Appellant
Medi-Wheels of the Palm Beaches, Inc.

## **CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **8,149 words**, exclusive of those items listed in Fed. R. App. P. 32(f).

2. This document complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2024, I caused a copy of the foregoing to be served by electronic means via the Court's CM/ECF system on all counsel registered to receive electronic notices, which includes Appellee's counsel of record in the instant appeal.

*//ss// William M. Norris*
William M. Norris

36